IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                              |   |                                  |
|------------------------------|---|----------------------------------|
| KEY GOVERNMENT FINANCE, INC. | : |                                  |
|                              | : |                                  |
| v.                           | : | Civil Action No. DKC 11-3489     |
|                              | : |                                  |
| E3 ENTERPRISES INC., ET AL.  | : |                                  |
|                              | : |                                  |

**MEMORANDUM OPINION**

Presently pending and ready for review in this breach of contract case is the motion for summary judgment filed by Plaintiff Key Government Finance, Inc. ("KGF"). (ECF No. 17).[1] The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion for summary judgment will be granted in part and denied in part.

**I.   Background**

Unless otherwise noted, the facts outlined here are construed in the light most favorable to the non-moving parties, Defendants E3 Enterprises, Inc. ("E3") and Meridian Imaging Solutions, Inc. ("Meridian").

---

[1] According to Plaintiff's motion, the caption of the complaint incorrectly identified Plaintiff as "Key Government Finance Corp." (ECF No. 17, at 1). The clerk will be directed to correct the party name to "Key Government Finance, Inc."

Given the numerous contracts at issue in this action, a brief overview of the parties and their relationships is instructive. KGF is a Colorado corporation that provides financing to government contractors who lease equipment to federal agencies. Under these financing arrangements, KGF purchases the equipment to be leased to the federal government. In exchange, the contractor assigns the lease payments owed by the federal government to KGF, often less some amount the contractor retains for servicing the contract on a regular basis. E3 is a Maryland corporation that sells and leases copier equipment and software to the federal government. Meridian is a Virginia corporation that is in the copier services industry. This dispute arises out of a financing arrangement among KGF, E3, and Meridian in connection with a prime contract to provide copier equipment and services to the United States Army ("the Army").

On November 26, 2007, KGF and E3 entered into a Master Purchase Agreement, which established a blanket financing arrangement between the two entities. (*See* ECF No. 17-2). In other words, the Master Purchase Agreement established the general parameters of an ongoing financing relationship between E3 and KGF, which could be modified *via* "Assignment Schedules" as E3 actually received contracts from the federal government. KGF agreed that, when E3 received a contract from the government

("the Prime Contract"), KGF would fund the purchase price of the equipment and software to be leased to the government agency in question ("the User") in exchange for an assignment of the lease payments due to E3.

The Master Purchase Agreement imposes a number of responsibilities on KGF, as the "Buyer," and E3, as the "Seller."  Relevant here, E3 is required to "use its best efforts, to obtain annual renewals for the Prime Contract by the renewal date applicable to the Prime Contract . . . and shall use its best efforts to obtain the exercise of any end of term purchase options by the User under a Prime Contract prior to the end of the term of such Prime Contract." (*Id.* at 7).[2]

The Master Purchase Agreement also allocated certain risks associated with the User's non-payment or termination of a Prime Contract.  E3 agreed to assume "all risks related to User's nonpayment or abatement of any one or more Lease Payments for any reason other than Non-renewal, Non-appropriation, Termination for Convenience, or a User Default." (ECF No. 17-2, at 6).  KGF, in turn, agreed to assume "all risks related to nonpayment of the Lease Payments due to termination of the Prime Contract by User due to Non-renewal, Non-appropriation, Termination for Convenience, or a User Default." (*Id.* at 8).

_____

[2] All page references to court documents in this Memorandum Opinion refer to CM–ECF pagination.

Article I of the Master Purchase Agreement includes the following definitions:

> "Cancellation" – Cancellation of the Prime Contract by the User pursuant to a Prime Contract clause which permits the User to terminate, cancel, or discontinue the Prime Contract without Liability to Seller for reasons other than Non-renewal, Non-appropriation, Termination for Convenience, or Termination for Default.

> "Non-appropriation" – Failure of the User to exercise any annual renewal of the Prime Contract due to the insufficiency of appropriated funds from Congress, provided that the User's determination is in no way related to any fault or performance deficiency by Seller.

> "Non-renewal" – Failure of User to exercise any annual renewal of the Prime Contract due to a determination by the User that such renewal is not in the best interests of the Government, provided that the User's determination is in no way related to any fault or performance deficiency by Seller.

> "Termination for Convenience" – Termination of the Prime Contract pursuant to a FAR-standard, Termination for Convenience clause set forth in FAR 52.249 or FAR 52.212-4(l), provided that the termination is in no way related to any fault or performance deficiency by Seller.

> "Termination for Default" – Termination, cancellation or invalidation of the Prime Contract for any reason related to any fault or performance deficiency by Seller.

(*Id.* at 2-4).   In section 10.07, the Master Purchase Agreement provides that "[t]his Agreement shall be construed in accordance with and governed by the laws of the State of New York; and the

exclusive venue for all litigation arising between the parties related to this Agreement, or any Assignment Schedule issued hereunder, shall be in the state or federal courts sitting in the State of New York." (*Id.* at 14).

On July 18, 2008, the Army awarded E3 a contract to provide copier services at Fort Belvoir, Virginia ("the Prime Army Contract"). (ECF No. 17-4). The initial period of performance for the Prime Army Contract ran from July 14, 2008 to July 13, 2009. The Prime Army Contract also included four one-year option periods that could be unilaterally exercised by the Army.

On or about September 17, 2008, KGF and E3 executed "Assignment Schedule No. 2" to supplement the Master Purchase Agreement with the specific details of the Prime Army Contract. (ECF No. 17-2, at 35-37). Assignment Schedule No. 2 established that KGF would purchase the equipment to be provided under the Prime Army Contract at a price of $343,047.14, in exchange for assignment of sixty (60) monthly lease payments of $10,223.52, less $3,019.54 to be paid each month to E3 and Meridian. Assignment Schedule No. 2 expressly stated that E3, the Seller, did not "assume[] the risk" of "Non-renewal," "Non-Appropriation," or "Termination for Convenience," as those terms are defined by the Master Purchase Agreement.

On September 22, 2008, KGF, E3, and Meridian entered into a "Servicing Rider" to Assignment Schedule No. 2, whereby KGF

appointed E3 and Meridian to function as KGF's agents for servicing all lease payments under the Prime Army Contract. (ECF No. 17-5).   The Servicing Rider expressly incorporated the terms, conditions, and definitions of the Master Purchase Agreement, except as specifically amended.   (*Id.* at 2). Paragraph 3, titled "Limitations of Agency," prohibits E3 and Meridian from "[t]ak[ing] any other action or omit[ting] to take any action which may have a material adverse impact on the Serviced Payments." (*Id.*).

Paragraph 15 of the Servicing Rider includes an indemnification clause as follows:

> [E3] and MERIDIAN each hereby agrees, jointly and severally, to indemnify, defend and hold [KGF] and its affiliates, agents, contractors, employees, officers and directors ("[KGF] Indemnitees") against, and indemnify and hold harmless the [KGF] Indemnitees from and against, any and all liabilities, obligations, losses, damages, penalties, claims actions, suits, costs, expenses and disbursements (including, without limitation, reasonable attorneys' fees and costs) of whatever kind or nature ("Claims") imposed or assumed by, incurred by or asserted against any [KGF] Indemnitees caused by, related to or arising out of or are attributable to any act, omission, representation, misrepresentation by [E3] or MERIDIAN and its respective employees or agents in connection with this Servicing Rider or [E3's] or MERIDIAN's breach of this Servicing Rider.

(*Id.* at 6-7).

Paragraph 15 goes on to amend the allocation of risk set forth in the Master Purchase Agreement and Assignment Schedule No. 2 as follows:

> Further, [E3] and MERIDIAN each hereby agrees, jointly and severally, to defend and hold the [KGF] Indemnitees against, and indemnify and hold harmless the [KGF] Indemnitees from and against, any and all Claims that arise out of or are attributable to the form of Instrument of Assignment of the Prime Contract, the form of Notice of Assignment of the Prime Contract, the validity of the co prorate legal name and legal entity status of [E3], and in the case of the Prime Contract, Termination for Default or Termination for Cancellation, including without limitation: if a Termination for Default occurs, MERIDIAN shall pay [KGF] the Remaining Balance within thirty (30) days after [KGF] receives written notice from User of the Termination for Default. If a Cancellation occurs, MERDIAN shall pay [KGF] the Discounted Balance within thirty (30) days after [E3] receives written notice from User of the Cancellation. In the event of (a) any Non-renewal other than Non-appropriation of funds or (b) Termination for Convenience of such Prime Contract, MERDIAN shall pay [KGF] the Discounted Balance of the Serviced Payments, except for the portion covering maintenance and supplies, within thirty (30) days after [E3] receives written notice from User of such event.

(*Id.* at 7).[3]

---

[3] The Master Purchase Agreement defines "Discounted Balance" as "[t]he unpaid total Lease Payments discounted to present value at the rate of 4% per annum, plus the non-discounted end of lease term purchase option price assigned to, and purchased by, Buyer, or if no lease term purchase option price, that the

Sometime in mid-July 2010, the Army notified E3 that it would not be exercising the second option year of the Prime Army Contract (*i.e.*, the period from July 14, 2010 to July 13, 2011). (ECF No. 18-6, at 2). In an email dated August 10, 2010, the Army characterized its decision as being "due to funding issues" because E3 "has acknowledged that they are not listed on the current required BPA for copiers." (*Id.*).[4] Eric Fernandez, a Vice President with E3, likewise characterized the Army's decision as being due to "internal funding issues." (ECF No. 17-6, at 2). Mr. Fernandez avers in his declaration that he believes that "the local funding for the Ft. Belvoir Garrison and the [Prime Army Contract] was removed in favor of another funding vehicle for which E3 did not qualify." (ECF No. 18-2, Fernandez Decl. ¶ 3). It is undisputed that the Army's decision was not due to any fault or performance deficiency of either E3 or Meridian.

---

residual value set forth in the Assignment Schedule, if any. Buyer's calculation of the Discounted Balance will be definitive, absent manifest error." (ECF No. 17-2, at 2).

[4] A "BPA" or "Blanket Purchase Agreement" is a simplified method through which federal government agencies can fulfill their recurring needs for supplies or services. *See* U.S. General Services Administration, Blanket Purchase Agreements (BPAs), http://www.gsa.gov/portal/content/199353, last visited Feb. 7, 2013.

Over the next several months, E3 contacted the Army on numerous occasions about reconsidering its decision and extending the Prime Army Contract.   (ECF No. 18-2, Fernandez Decl. ¶ 11).   With KGF's approval, E3 also submitted two proposals for new contracts to provide copier services at Fort Belvoir, one for a six-month period of performance and one for a one-year period of performance.   (*Id.*).

At some point while these two proposals were "on the table" for the Army's review, the Army asked E3 to provide a quote for extending its services through November 30, 2010.   (*Id.*).[5]   In response, Mr. Fernandez sent an email to the Army indicating that E3 wanted the period of performance for any extension contract to cover at least one year "because his financial institution [KGF] would not agree to the 30 November 2010 extension."   (*See* ECF No. 17-7, at 2).   E3 represents that because "[i]t was already October 2010[,] . . . a November 30, 2010 re[newal] did not seem to be reasonable."   (ECF No. 18-2, Fernandez Decl. ¶ 11).   KGF maintains, however, that E3 never

---

[5] There is some dispute about when the Army requested a quote for copier services through November 30, 2010.   According to KGF, the Army requested the quote during a September 20, 2010 meeting between Mr. Fernandez and William Campbell, the Army's contracting officer.   Although Mr. Fernandez agrees that a September 20th meeting took place, he avers that "[i]t was already October 2010" when "the Army requested the November 30th date."   (ECF No. 18-2, Fernandez Decl. ¶ 11).

asked whether KGF would agree to a November 30, 2010 extension to the contract. (ECF No. 17-1, Bleeker Decl. ¶ 27).

Rather than submitting a quote as requested, E3 instead sent a letter on October 4, 2010, that again asked the Army to reconsider its "cancel[ation]" of the Prime Army Contract. (ECF No. 17-6, at 2). In its letter, E3 stated that "[w]e understand that upon cancellation of our contract, it is the Government's intention to replace existing equipment with Sharp equipment (contracting with a large business Sharp Corporation), without having issued a formal solicitation." (*Id.*). E3 expressed its confusion about how the Army could award a new contract without issuing formal solicitations. E3 also noted that, in a meeting on September 20, 2010, the Army informed E3 that it "could file a claim to recover remaining payments on equipment installed under [the Prime Army Contract]." (*Id.*). Apparently interpreting this instruction to mean that filing a claim would assure E3's receipt of the remaining three years' worth of payments, E3 communicated its "consternation" that such "payments would be made in conjunction with the issuance of payments for a new contract to Sharp Corporation," meaning that "the U.S. Government is willing to pay double for the same commodities and services." (*Id.*).

On October 19, 2010, the Army sent a letter denying E3's "request for reconsideration of the cancellation" of the Prime

10

Army Contract.  (ECF No. 17-7, at 2).  The letter explained that the Army had conducted a competition for copier services at Fort Belvoir in accordance with "the Enterprise Copier Support Ordering Guide."  The letter further advised that the Army did not ask E3 to submit a quote because, as of July 2010, E3 was not one of the approved contractors included in this guide (*i.e.*, E3 was "not listed as a BPA holder").  The letter also clarified that any claim submitted by E3 would need to be reviewed, such that it was "premature" for E3 to assume that the Army would pay for the three unexercised option years of the Prime Army Contract.  Finally, the letter stated that the copiers provided by E3 pursuant to the Prime Army Contract "are to be picked up immediately" and set forth the procedural guidelines for appealing the Army's final decision.  (*Id.*).

Although E3 admits that it did not submit a quote to the Army to extend the contract through November 30, 2010, Mr. Fernandez avers that E3 "used [its] best efforts to secure contracts and claims on behalf of KGF and Meridian," including by submitting "multiple proposals, requests for reconsideration and claims."  (*Id.* ¶ 11).  In particular, Mr. Fernandez represents that E3 did seek and receive a modification of the Prime Army Contract "covering the period to October 30, 2010." (ECF No. 18-2, Fernandez Decl. ¶ 11).  E3 ultimately filed a claim with the Army seeking $40,317.64 for the period from July

2010 to October 2010, which the Army paid. (*Id.* ¶ 12). Mr. Fernandez also represents that "KGF received full payment coverage through October 30, 2010," the entire time its equipment was installed at Fort Belvoir. (*Id.* ¶ 13).

On November 23, 2010, KGF sent a letter to Meridian stating that "[t]he [Army's] decision not to exercise the option year to continue services under the Prime [Army] Contract in lieu of soliciting new offers for copier services clearly constitutes a 'Non-renewal' as defined under the [Master Purchase Agreement] thereby triggering recourse liability against Meridian for payment of the Discounted Balance . . . in the amount of $244,004.32." (ECF No. 17-8, at 2). To date, Meridian has not complied with KGF's demand for payment of the Discounted Balance. (ECF No. 17-1, Bleeker Decl. ¶ 34).

### A.   Procedural Background

On December 5, 2011, KGF filed a three-count complaint against Defendants, invoking this court's diversity jurisdiction. (ECF No. 1). Count I alleges that Meridian breached the Servicing Rider by refusing to pay the Discounted Balance to KGF. (*Id.* ¶¶ 22-28). Count II alleges that E3 breached the Master Purchase Agreement and Servicing Rider by "failing to accept the [Army's] offer to extend the [Prime] Army Contract through November 30, 2010." (*Id.* ¶¶ 29-34). Count III alleges that – pursuant to the indemnification clause in the

Servicing Rider – E3 and Meridian are jointly and severally liable for each other's alleged breaches. (*Id.* ¶¶ 35-38). Meridian and E3 answered the complaint, respectively, on January 12 and April 27, 2012. (ECF Nos. 7, 14).  On June 28, KGF moved for summary judgment.  (ECF No. 17).  Defendants filed a joint opposition (ECF No. 18), and KGF replied (ECF No. 19).

## II.  **Standard of Review**

Summary judgment may be entered only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Summary judgment is inappropriate if any material factual issue "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *JKC Holding Co. LLC v. Wash. Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed.R.Civ.P. 56(e)).  "A mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).  "If the

evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted).   At the same time, the facts that are presented must be construed in the light most favorable to the party opposing the motion.   *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Emmett*, 532 F.3d at 297.

## III. Analysis

### A.   Choice of Law

The parties dispute whether New York or Virginia law applies to KGF's claims.   In its motion, KGF assumes that New York law applies based on a contractual choice of law provision. (ECF No. 17-9, at 17).[6]   In their opposition, Defendants argue

---

[6] KGF relies on a provision in a December 13, 2007 amendment to the Master Purchase Agreement which states that "[t]he validity, interpretation, and construction of this Amendment shall be governed by and construed in accordance with the law of the State of New York."   (ECF No. 17-3, at 2).   KGF does not invoke Section 10.07 of the Master Purchase Agreement, which is incorporated by reference into the Servicing Rider, and explicitly states that "[t]his Agreement shall be construed in accordance with and governed by the laws of the State of New York."   (ECF No. 17-2, at 14).

Section 10.07 of the Master Purchase Agreement also states that "the exclusive venue for all litigation arising between the parties related to this Agreement, or any Assignment Schedule issued hereunder, shall be in the state or federal courts sitting in the State of New York."   (*Id.*).   Fed.R.Civ.P. 12(h)(1)(B) provides that a party waives the defense of improper venue by failing to either (i) raise it in a Rule 12 motion or (2) include it in a responsive pleading.   In their answers, both Meridian and E3 raise improper venue as an affirmative defense, citing to Section 10.07.   (*See* ECF No. 7, at 5; ECF No. 14, at

that (1) the choice of law provision should be ignored because there is no reasonable basis for applying New York law and (2) the law of Virginia, where the parties executed the Servicing Rider, should govern.  (ECF No. 18-1, at 6-7, n. 1).  In its reply, KGF posits that the choice of law provision "must be upheld . . . as Key Equipment Finance has offices in New York, and substantially contracts and does business in the chosen jurisdiction."  (ECF No. 19, at 5).

Notably, KGF does not provide any explanation of its relationship with "Key Equipment Finance" and thus it is unclear how that entity's activities in New York are relevant to the parties' choice of law dispute.[7]  At this stage, however, it is

_____

4).  The Defendants do not, however, raise any arguments regarding venue in their joint opposition.  (*See generally* ECF No. 18).  Thus, notwithstanding their technical compliance with Rule 12(h)(1), Defendants likely have waived any objection to venue by opting to litigate on the merits.  *See* 5C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1391 (3$^d$ ed.) ("[A] party can be held to have waived a defense listed in Rule 12(h)(1) through conduct, such as extensive participation in the discovery process or other aspects of the litigation of the case even if the literal requirements of Rule 12(h)(1) have been met[.]").

[7] As the parties observe, "[t]he Maryland Court of Appeals 'has long recognized the ability of contracting parties to specify in their contract that the laws of a particular State will apply in any dispute over the validity, construction, or enforceability of the contract . . . .'"  *Cleaning Authority, Inc. v. Neubert*, 739 F.Supp.2d 807, 818 (D.Md. 2010) (quoting *Jackson v. Pasadena Receivables, Inc.*, 398 Md. 611, 617 (2007)).  Defendants rely on one of the two exceptions to this general rule, which is that a contractual choice of law provision will

not necessary to resolve the issue because, as set forth below, the fundamental principles of contract interpretation are the same under both Virginia and New York law.

**B.   Count I – Breach of Contract By Meridian**

As to Count I, it is undisputed that the express terms of the Servicing Rider require Meridian to pay KGF the Discounted Balance of the Prime Army Contract in the event of (1) "a Cancellation"; (2) "any Non-renewal other than Non-appropriation of funds," or (3) "Termination for Convenience." (ECF No. 17-5, at 7). Thus, the only dispute is one of contract interpretation – specifically, whether the Army's decision not to exercise the remaining option years of the Prime Army Contract constitutes a "Non-renewal other than Non-appropriation of funds" within the meaning of Paragraph 15.

KGF argues that, pursuant to the unambiguous definition set forth in the Master Purchase Agreement, a "Non-appropriation" occurs only when the federal government does not renew a contract because Congress failed to appropriate funds for the

---

not be honored if "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Nat'l Glass, Inc. v. J.C. Penney Props., Inc.*, 336 Md. 606, 610 (1994) (quoting Restatement (Second) Conflict of Laws § 187(2) (1989)). Given KGF's ambiguous explanation of its relationship with Key Equipment Finance, it is not clear if that entity's New York-based activities provide "a reasonable basis" for the parties' designation of New York law.

services or equipment provided under that contract. (ECF No. 17-9, at 19-20). According to KGF, that scenario did not occur here, based on the evidence establishing that, soon after communicating its decision not to renew the Prime Army Contract, the Army sought quotes from different vendors under a different bidding process to provide copier services at Fort Belvoir.

Defendants raise two principal arguments in response. First, Defendants maintain that, when the Master Purchase Agreement and the Servicing Rider are construed together in their entirety, it is clear that the parties intended that E3 and Meridian would be liable to KGF only if the Army's decision not to renew the Prime Army Contract "was due to some <u>fault</u> of E3 or Meridian." (ECF No. 18-1, at 6-7). Second, Defendants contend that "Non-appropriation of funds" can only reasonably be interpreted as referring to a lack of funding for the specific agreement between E3 and the Army, rather than a lack of funding for the copier services provided under that agreement. (*Id.* at 8-10). Neither of Defendants' arguments is availing.

Under both Virginia and New York law, contracts are to be construed in accordance with the parties' intent, which typically is best evidenced by the language of the contract itself. *See Pocahontas Mining LLC v. CNX Gas Co.*, 276 Va. 346, 352 (2008) ("A court's primary focus in considering disputed contractual language is to determine the parties' intention,

17

which should be ascertained, whenever possible, from the language the parties employed in their agreement."); *Cont'l Ins. Co. v. Atl. Cas. Ins. Co.*, 603 F.3d 169, 180 (2$^{\text{d}}$ Cir. 2010) (New York law) ("When interpreting a contract, the intention of the parties should control . . .[, and] the best evidence of intent is the contract itself.") (internal quotation marks omitted) (alteration in original).  Where an agreement is unambiguous (*i.e.*, where it is susceptible to only one reasonable interpretation), both Virginia and New York law require the contract to be enforced according to the plain meaning of its terms, without resort to extrinsic evidence.  *See Amos v. Coffey*, 228 Va. 88, 92 (1984) ("[W]hen the parties set out the terms of their agreement in a clear and explicit writing then such writing is the sole memorial of the contract and . . . the sole evidence of the agreement.") (internal quotation marks omitted); *Brad H. v. City of New York*, 17 N.Y.3d 180, 185 (2011) (a contract "that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties"; "extrinsic evidence may be considered only if the agreement is ambiguous").  Likewise, in determining whether ambiguity exists, both Virginia and New York law require consideration of the contract "as a whole."  *See Pocohontas*, 276 Va. at 353; *Brad H.*, 17 N.Y.3d at 185.  It also is well-settled

under both states' law that contractual language will not be rendered ambiguous merely because the parties disagree about the meaning of such language. *See Wilson v. Holyfield*, 227 Va. 184, 187 (1994); *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2$^d$ Cir. 1992).

Here, the Master Purchase Agreement defines "Non-appropriation" as the "[f]ailure of the [Army] to exercise any annual renewal of the [Prime Army Contract] due to the insufficiency of appropriated funds from Congress, provided that the [Army's] determination is in no way related to any fault or performance deficiency by [E3]." (ECF No. 17-2, at 3). "Non-renewal" means the "[f]ailure of [the Army] to exercise any annual renewal of the Prime Contract due to a determination by the [Army] that such renewal is not in the best interests of the Government, provided that the [Army's] determination is in no way related to any fault or performance deficiency by [E3]." (*Id.*).

The plain language of these definitions establishes that Meridian can be held liable even if the Army's decision was unrelated to any fault by E3 or Meridian. Under Paragraph 15 of the Servicing Rider, Meridian is liable for "*any* Non-Renewal other than Non-Appropriation of funds." (ECF No. 17-5, at 7) (emphasis added). A "Non-Renewal," by definition, cannot relate to any fault or performance deficiency. Thus, contrary to E3

and Meridian's argument, the presence or absence of fault by Defendants is not dispositive.

Defendants attempt to avoid this result by arguing that the parties never intended that E3 or Meridian would be liable to KGF "for reasons other than the fault of E3 or Meridian." (ECF No. 18-1, at 3). As evidence of the parties' intent, Defendants cite to an email from a KGF representative that states:

> Per the terms of the Assignment Schedule executed pursuant to [KGF's] Master Purchase Agreement (MPA) with E3, KGF assumed the risk of termination for non-appropriation, termination for convenience and nonrenewal. With regard to Termination for Default, that risk was assumed by E3.

(ECF No. 18-5, at 2). This document does nothing to advance Defendants' argument, however. First, under both New York and Virginia law, it is inappropriate to look beyond the four corners of a contract to ascertain the parties' intent, absent a finding of ambiguity. As set forth above, Paragraph 15 of the Servicing Rider unambiguously imposes liability on Meridian for "any Non-renewal other than Non-appropriation of funds," and "Non-renewal" likewise is unambiguously defined to encompass scenarios where the federal government's determination to end a contract "is in no way related to any fault or performance deficiency." Second, the email merely recites the allocation of risk set forth in the original Master Purchase Agreement and confirmed in Assignment Schedule No. 2. As explained above, the

Servicing Rider – which was executed by E3, Meridian, and KGF after Assignment Schedule No. 2 – specifically amended these provisions by reallocating certain risks to Meridian.

Because Defendants' fault is irrelevant to determining Meridian's liability under the Servicing Rider, the critical question is whether the Army's decision not to exercise the remaining option years of the Prime Army Contract was due to "a determination . . . that such renewal is not in the best interests of the Government" or due to "the insufficiency of appropriated funds *from Congress*." As discussed, the Army repeatedly characterized its decision not to exercise option year two of the Prime Army Contract as being due to "lack of funding" or "funding issues." At first blush, this explanation would appear to fall within the definition of "Non-appropriation" because, as Defendants observe, it is logical to presume that "the Army can obtain 'funding' only through appropriations." (ECF No. 18-1, at 6).

Upon closer examination, however, the explanation provided by the Army warrants a different conclusion. In an email dated August 10, 2010, the Army stated that "Option Year Two was not exercised due to funding issues. [E3] has acknowledged that they are not listed on the current required BPA for copiers." (ECF No. 18-6, at 2). Likewise, in its denial letter dated October 19, 2010, the Army explained that it had already

21

conducted a competition for copier services at Fort Belvoir
among eight BPA holders because such services "must be procured
in accordance with the use of the mandatory Enterprise Copier
Support Ordering Guide." (ECF No. 18-3, at 2).  The Army
further explained that, because E3 was not one of the eight BPA
holders listed in that guide, the Army did not request a quote
from E3 to provide future copier services.  (*Id.*).

Thus, the record establishes that the Army decided not to
exercise the second option year of the Prime Army Contract
because of internal requirements about the bidding process to be
used for copier services.[8]  The Army's explanations make no
reference to any insufficiency of funds *from Congress*, either
for copier services at Fort Belvoir or for the specific Prime
Army Contract.  Indeed, Mr. Fernandez himself has characterized
the Army's decision as being due to "*internal* funding issues"
(ECF No. 17-6, at 2) (emphasis added) and avers that the Army's
decision involved the reallocation of "*local* funding" to

---

[8] Defendants vigorously argue that KGF presents no competent
evidence that the Army did, in fact, enter into a contract with
Sharp for "the same equipment and services as provided under"
the Prime Army Contract.  (ECF No. 18-1, at 9).  At the same
time, however, Defendants themselves submit multiple
communications from the Army establishing (1) that the Army did
not exercise the second option year of the Prime Army Contract
because E3 is not an approved BPA holder and (2) that the Army
conducted a competition for copier services at Fort Belvoir
among the eight approved BPA holders without requesting a quote
from E3.  (*See* ECF Nos. 18-3, 18-6).

"another funding vehicle for which E3 did not qualify" (ECF No. 18-2, Fernandez Decl. ¶ 3).   Moreover, Defendants never argue that any action by Congress played a role in the Army's decision.

In sum, because the plain, unambiguous definition of "Non-appropriation" requires that the failure to exercise an annual renewal be due to "the insufficiency of appropriated funds *from Congress*," it cannot be said that the Army's decision not to exercise the remaining option years of the Prime Army Contract constituted a "Non-appropriation."   Rather, the Army's decision falls squarely within the definition of a "Non-renewal," as it (1) represented a determination that exercising the remaining option years was "not in the best interests of the Government" because E3 was not an approved vendor under the Army's then-current mandatory bidding process and (2) was unrelated to any fault of E3 or Meridian.   Thus, Meridian is liable to KGF for the Discounted Balance and breached the Servicing Rider by refusing to pay KGF this amount within 30 days of October 19, 2010, the date when E3 received written confirmation of the Army's final decision.

As to damages, KGF represents that it is entitled to, *inter alia*, an award of $224,494.38, representing the Discounted Balance.   The Master Purchase Agreement specifically states that KGF's calculation of the Discounted Balance "will be definitive,

23

absent manifest error." (ECF No. 17-2, at 2). Because Defendants do not contest the figure proposed by KGF and because there is no error evident in KGF's calculation, KGF will be awarded $224,494.38 in damages pursuant to Count I.[9]

### C.   Count II – Breach of Contract By E3

KGF also seeks judgment on its claim that E3 breached its contractual obligations to use "best efforts" to obtain renewals of the Prime Army Contract and to protect the lease payments due thereunder. KGF specifically cites to the following actions by E3 as evidence of its breaches: (1) refusing "the extension of the [Prime] Army Contract offered by the Army" through November 30, 2010; (2) misrepresenting that KGF would not agree to an extension through November 30, 2010; and (3) failing to pursue any appeal of the Army's decision. (ECF No. 17-9, at 26-27). KGF seeks damages of $36,019.90, purportedly representing the amount of the "lease payments between July and November 2010" that E3 would have received had it "accepted the [Army's] offer

---

[9] KGF also asserts that it is entitled to: (1) $44,226.50 in accrued interest on the Discounted Balance, through November 22, 2011, plus additional interest that "continues to accrue" at a rate of $112.25 per diem; and (2) an unspecified amount in "accruing attorneys' fees and costs." (ECF No. 17-1, Bleeker Decl. ¶¶ 36-37). It is unclear, however, whether KGF seeks these forms of recovery pursuant to a contractual provision, a statute, or some combination thereof. Moreover, because KGF's motion for summary judgment will be denied as to the remaining counts, it is premature to resolve the issues of attorneys' fee, costs, and interest at this stage.

to extend the [Prime] Army Contract through at least November 30, 2010." (*Id.* at 13).

In their opposition, Defendants argue that summary judgment is not appropriate as to Count II because genuine disputes of material fact remain. (ECF No. 18-1, at 10). Notably, E3 admits that it did not submit a quote to the Army for an extension of the Prime Army Contract through November 30. (ECF No. 18-2, Fernandez Decl. ¶ 11). E3 nonetheless maintains that it exercised "best efforts" in other ways, including by requesting reconsideration of the Army's decision and submitting proposals to the Army for new contracts with longer periods of performance. Defendants also submit evidence contradicting KGF's purported entitlement to $36,019.90 in lease payments. Mr. Fernandez represents that E3 prevailed on a claim against the Army for $40,317.64, representing payment from July 2010 through October 30, 2010, and that KGF received its full share of this payment on April 15, 2011. (ECF No. 18-2, Fernandez Decl. ¶¶ 12-13).

If E3's version of events is credited, a reasonable jury could find that E3 met its contractual obligations to use "best efforts." Thus, summary judgment as to Count II is not warranted at this time.

D.   **Count III – Indemnification**

Finally, KGF moves for judgment as to Count III, which seeks to hold Meridian and E3 liable for each other's alleged contractual breaches.   To support its position, KGF relies the following provision in Paragraph 15 of the Servicing Rider:

> [E3] and MERIDIAN each hereby agrees, jointly and severally, to indemnify, defend and hold [KGF] and its affiliates, agents, contractors, employees, officers and directors ("[KGF] Indemnitees") against, and indemnify and hold harmless the [KGF] Indemnitees from and against, any and all liabilities, obligations, losses, damages, penalties, claims, actions, suits, costs, expenses and disbursements (including, without limitation, reasonable attorneys' fees and costs) of whatever kind or nature ("Claims") imposed or assumed by, incurred by or asserted against any [KGF] Indemnitees caused by, related to or arising out of or are attributable to any act, omission, representation, misrepresentation by [E3] or MERIDIAN and its respective employees or agents in connection with this Servicing Rider or [E3's] or MERIDIAN's breach of this Servicing Rider.

(ECF No. 17-5, at 7).

KGF correctly characterizes this excerpt as an indemnification clause, but misconstrues what effect the provision has here.   The clause cited establishes a bilateral indemnity relationship, with E3 and Meridian on one side and KGF on the other.   Pursuant to this relationship, E3 and Meridian agreed to indemnify KGF against "Claims" – meaning "liabilities, obligations, losses, damages, penalties, claims, actions, suits,

26

costs, expenses and disbursements" that have been asserted against or incurred by KGF and are the result of either E3's or Meridian's actions.  One hypothetical scenario that would fall squarely within this express language is if an Army employee brought a personal injury suit against KGF alleging that she slipped and fell because Meridian had negligently allowed copier toner to leak onto the floor.  In this hypothetical scenario, E3 and Meridian would – pursuant to the contractual language of Paragraph 15 – be jointly and severally liable to KGF for the costs of defending against the employee's lawsuit (including attorneys' fees and litigation costs), along with any damages ultimately awarded to the employee.

Here, by contrast, KGF is attempting to construe Paragraph 15 as establishing a bilateral guaranty relationship between E3 and Meridian, whereby E3 is jointly and severally liable for any debts that Meridian alone incurs as a result of breaching the Servicing Rider and vice versa.  The plain language of Paragraph 15 cannot be read as establishing such a relationship, and KGF offers no reasoned analysis in support of its interpretation. Accordingly, although E3 and Meridian have not filed a cross motion for summary judgment, Defendants are entitled to judgment as a matter of law as to Count III of the complaint.  *See, e.g., Potomac Riverkeeper, Inc. v. Nat'l Capital Skeet & Trap Club, Inc.*, 388 F.Supp.2d 582, 586 (D.Md. 2005) ("The Court may enter

summary judgment *sua sponte* in favor of the non movant when it is considering a properly noticed motion for summary judgment from the moving party on an identical issue.").

## IV.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Plaintiff Key Government Finance, Inc., will be granted in part and denied in part.  A separate Order will follow.



<u>        /s/                    </u>
DEBORAH K. CHASANOW
United States District Judge